UNITED STATES

v.

**Senior Airman Oscar C. TORRES, FR 451–47–1983, United States Air Force.**

**ACM 27088.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 3 June 1988.

Decided 31 Jan. 1989.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Captain William E. Boyle.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni and Major Terry M. Petrie.

Before HODGSON, FORAY and HOLTE, Appellate Military Judges.

### DECISION

HODGSON, Chief Judge:

Kathy H. and her younger sister Ellen became wards of the State of Wyoming after it was discovered that their natural father had repeatedly sexually abused Kathy and her older sister, Joan.[1] This abuse began when Kathy was eight years old. It continued until she was a little over 12 when she and Ellen were removed from their father's custody and placed in a series of foster homes, the last of which was the appellant's household.

At the time the appellant and his wife accepted Kathy and her younger sister as foster children she was 13 years old and Ellen was 11. The appellant knew that Kathy had been physically and sexually abused by her father and that she was in

---

1. These are not the girl's real names.

an emotionally vulnerable state, and for this reason it was suggested to him that he avoid being alone with her. Kathy's caseworker described her as a "compliant child" who was likely "to withdraw in a time of conflict, anger or frustration." She had never been a disciplinary problem in any of her three previous foster homes.

Kathy and Ellen began living with the appellant on approximately 4 May 1987, and in the beginning everything was fine, and Kathy thought the family was "nice." Since this was her fourth foster home in a little over a year she wanted the placement to "work."

Some three weeks after she moved in, the household went to Littlefield, Texas, for about five days to visit the appellant's family. They stayed one night at his sister's home. While there the appellant, his wife, and Kathy slept in the same bed. Sometime during the night, after his wife left the bed, the appellant removed Kathy's pajamas and had sexual intercourse with her. He stopped after a while, went to the bathroom, then returned and continued having sexual relations. While they were together the appellant's sister, Monica, who was at the house, came into the room and told him to "get off." Monica asked Kathy "not to tell anyone as it would get [the appellant] in trouble." Kathy testified she did not yell or scream because she was "scared" as she had "just got over with my dad and here it was again." Later, the appellant told Kathy that his wife [Veronica] knew he had asked for sex and she did not object.

On 3 June, after the family returned to Cheyenne, and just before Kathy was leaving for school, the appellant took her into the bedroom and indicated "he wanted to do sex with [her]." When she said it was her menstrual cycle, he said, "Well, what's the difference?," laid his uniform coat on the the bedroom floor, and had sexual intercourse with her. He quit when his wife and sister-in-law returned to the home.

After they moved on-base in July, the appellant continued to have sexual relations with Kathy, but stopped his sexual advances in early October. Kathy never told the appellant's wife what was happening as she apparently knew. The appellant had already told Kathy that he had had sexual relations with Emma Thompson, a neighbor, and his wife did not care as she had watched them.

On 4 December, Kathy told her older sister, Joan, that "the [appellant] was doing the same thing our dad did to us." After Kathy ran away from the appellant's home, the appellant's alleged sexual activities were reported to the Wyoming Department of Public Assistance and Social Services (DPASS).

The next day, 5 December, an Office of Special Investigations (OSI) agent, a member of the Laramie County Sheriff's Office, and a social worker from DPASS went to the appellant's on-base quarters. The social worker took custody of Ellen. The OSI agent told the appellant about the allegations they had received concerning Kathy, and asked if he would come to their office to discuss the matter. He was specifically told he was not under apprehension.

When the appellant arrived at the OSI office he was given the proper Codal warnings and advised of his right to counsel. Thereafter, the appellant admitted having sexual relations with Kathy on three different occasions—once in Texas and twice while they were living in Cheyenne. He also acknowledged an adulterous relationship with the next door neighbor. He denied that his wife knew of his relationship with Kathy. He indicated that "Kathy never tried to fight me or said she didn't want to have sexual intercourse with me during any of the three times we had intercourse." He stated that the first incident occurred when he was drunk, and he gets "real horny" when he is drunk.

At trial the appellant testified that Kathy was a willing partner in their relationship, and eagerly participated in the sexual foreplay. He related she "moaned" during their sexual encounters and indicated she "liked it." Kathy agreed that the appellant never "forced" her to have sexual intercourse and he was always "gentle" with her; she denied any "french kissing" or sexual foreplay. Further, she stated that

any "moaning" on her part was the result of pain not pleasure. The appellant's sister, Monica, testified that when she caught Kathy and her brother in bed together, Kathy had her arms around him. Later, Kathy begin to cry and begged her not to tell the appellant's wife.

This evidence resulted in the appellant's conviction for rape, carnal knowledge, and adultery. The approved sentence extends to a dishonorable discharge, eight years confinement, and reduction to airman basic.

I

Appellate defense counsel assert that the findings of guilty as to rape (Specifications 1 and 2, Charge I) cannot stand as they are contrary to law and to the evidence admitted at trial. They argue that the evidence establishes "a willingness on [Kathy's] part to participate in and to enjoy the pleasures of sex." Thus, in their view, a reasonable doubt exists as to whether force, an essential element of the crime of rape, was exerted to effect a sexual union between the appellant and the victim.

 The issue before us is whether the victim, a 13 year old child, voluntarily chose to engage in sexual intercourse with an individual standing *in loco parentis.* The resistance of a rape victim is a relative term and must be considered in accordance with the special circumstances of each case. *United States v. Steward,* 18 M.J. 506 (A.F.C.M.R.1984) (concurring opinion by J. Miller); *pet. denied* 19 M.J. 46 (C.M.A.1984); *United States v. Dejonge,* 16 M.J. 974 (A.F.C.M.R.1983); *pet. denied* 18 M.J. 92 (C.M.A.1984). The force used to accomplish sexual intercourse may be actual or constructive. *United States v. Hicks,* 24 M.J. 3 (C.M.A.1987). Further, the force used need not be overt and physically brutal, but can be subtle and psychological. *State v. Fowler,* 27 Ohio App.3d 149, 500 N.E.2d 390 (1985). In such a situation the equivalent to physical force is present. *United States v. Dejonge, supra.* Clearly, a 13 year old child should not be expected to resist in the same manner as a mature adult.

The sexual abuse of children by a parent or an individual standing *in loco parentis* is not, unfortunately, in a rare occurrence. In *State v. Etheridge,* 319 N.C. 34, 352 S.E.2d 673, 681 (1987), the North Carolina Supreme Court, in discussing intrafamilial sexual abuse, observed:

> Sexual activity between a parent and a minor child is not comparable to sexual activity between two adults with a history of consensual intercourse. The youth and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose.

Children placed in foster homes are even more vulnerable because they have been removed from familiar surroundings, unhappy though they may have been, and made to live with strangers. Here the victim had been placed in four such homes in a little over a year, and was an emotionally battered child who had been sexually abused by her father for years and beaten by him when ever she attempted to refuse his demands. It is no small wonder she permitted her new "father-figure" to do anything he wished. Kathy was described by her mental health therapist as feeling "powerless in the world she lived in." Expert testimony also made it clear that the role of a surrogate father can be so powerful that a 13 year old girl could not challenge it. Here, the appellant knew the child that the State of Wyoming had placed in his home had been sexually abused by her father. It was hoped that he would provide her stable surroundings in which the wounds of an earlier troubled time could heal. Yet within three weeks of her arrival, he also began to sexually abuse the child just as her father had.

As stated earlier as long as it can be shown that a rape victim's will was overcome by fear or duress, the forcible element of rape can be established. The Supreme Court of Oregon in *State v. Risen,* 192 Or. 557, 235 P.2d 764, 766 (1951) stated:

> Where submission of a girl is induced "through the coercion of one whom she

is accustomed to obey, such as a parent or one standing *in loco parentis,*" the law is satisfied with less than a showing of the utmost physical resistance of which she is capable. (citations omitted).

In reviewing the evidence we hold that the court below was justified in concluding beyond a reasonable doubt that Kathy H. did not willingly consent to have sexual intercourse with the appellant. *Griswold v. State,* 290 Ark. 79, 716 S.W.2d 767 (1986); *State v. Pignolet,* 465 A.2d 176 (R.I.1983); *State v. Eskridge,* 38 Ohio St.3d 56, 526 N.E.2d 304 (1988); *State v. Spaulding,* 313 N.W.2d 878 (Iowa 1981); *State v. Sunderland,* 4 Or.App. 1, 468 P.2d 900 (1970). We reach the same conclusion. Article 66(c), UCMJ; *United States v. Dejonge, supra; United States v. Steward, supra.*

## II

The remaining assigned error is resolved against the appellant. *United States v. Schneider,* 14 M.J. 189 (C.M.A.1982); *United States v. Horst,* 17 M.J. 796 (A.F.C.M.R. 1983); *see also United States v. Davis,* 13 M.J. 671 (A.F.C.M.R.1982).

For the reasons stated the findings of guilty and the sentence, both being correct in both law and fact, are

AFFIRMED.

Senior Judge FORAY and Judge HOLTE concur.