UNITED STATES, Appellee,

v.

Robert E. RHEA, Master Sergeant,
U.S. Air Force, Appellant.

No. 64,457.
ACM 27563.

U.S. Court of Military Appeals.

Argued Jan. 9, 1991.

Decided Sept. 30, 1991.

For Appellant: *Bryan G. Hershman, Esq.* (argued); *Major Bernard E. Doyle, Jr.* and *Major Ronald G. Morgan* (on brief); *Colonel Richard F. O'Hair* and *Lieutenant Colonel Jeffrey R. Owens.*

For Appellee: *Captain Thomas E. Wand* (argued); *Lieutenant Colonel Brenda J. Hollis* and *Major Terry M. Petrie* (on brief); *Colonel William R. Dugan, Jr.*

## *Opinion of the Court*

EVERETT, Senior Judge:

A general court-martial convicted appellant of rape, sodomy, assault and battery (2 specifications), committing indecent acts, and drunk and disorderly conduct, in violation of Articles 120, 125, 128, and 134, Uniform Code of Military Justice, 10 USC §§ 920, 925, 928, and 934, respectively. The court sentenced appellant to a bad-conduct discharge, confinement for 5 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review affirmed. 29 MJ 991 (1990).

On appellant's petition, we granted review of four issues,[1] two of which are

---

1.

> I
>
> WHETHER APPELLANT HAS BEEN DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY THE VOLUNTARY SURRENDER OF A WALL CALENDAR (I.E., PROSECUTION EXHIBIT 2) TO THE GOVERNMENT BY HIS COUNSEL, WHEN SAID EVIDENCE WAS GIVEN TO DEFENSE COUNSEL BY APPELLANT WITHIN THE PRIVILEGED AND CONFIDENTIAL SCOPE OF THE ATTORNEY-CLIENT RELATIONSHIP, WHEN APPELLANT'S COUNSEL INITIATED CONTACT WITH THE TRIAL JUDGE WITHOUT FIRST CONSULTING WITH APPELLANT, WHEN EXHIBIT 2 WAS NOT AN INSTRUMENTALITY OF THE CRIME, AND WHEN DISCLOSING EXHIBIT 2 TO THE COURT VIOLATED A CLIENT CONFIDENCE AND VIOLATED THE ATTORNEY-CLIENT PRIVILEGE.
>
> II
>
> WHETHER APPELLANT HAS BEEN DENIED A FAIR TRIAL DUE TO THE TRIAL COURT'S RULING ADMITTING PROSECUTION EXHIBIT # 2, WHEN THE TRIAL COURT LACKED JURISDICTION TO ADMIT THE EXHIBIT DUE TO THE IMPROPER EX PARTE FASHION IN WHICH THE COURT GAINED POSSESSION OF THE EXHIBIT, AND DUE TO THE TRIAL COURT'S IMPROPER BASIS FOR ADMISSION OF THE CALENDAR AS A PRIOR CONSISTENT STATEMENT.
>
> III
>
> WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT IN ADMITTING, OVER THE OBJECTION OF APPELLANT, THREE BOOKS WHICH INCLUDED STORIES OF A SEXUAL

closely related and will be treated together. Although we decide the granted issues adversely to appellant, our review has revealed some additional matters that require remand to the court below.

## I

### A

When she was 20 years old, Rhea's Thai stepdaughter, Youie, revealed that, from the time she was 13 years old, Rhea had sexually abused her, to include French kissing her and fondling her private areas, sexual intercourse, and fellatio.[2] The abusive conduct came to light only after Rhea had caught Youie in bed at her boyfriend's[3] apartment and had assaulted both of them in a fit of jealousy.

From the outset of these revelations, Rhea denied them outright. He did acknowledge that he disliked Youie's boyfriend and that he had lost control when he saw them in bed together, but he denied all allegations of any sexual activity between himself and his stepdaughter.

Youie made her charges in October 1987. Shortly thereafter, Rhea was given the services of two military defense counsel. In late November, counsel suggested that Rhea bring to their office " 'any documents, letters, papers, books, those sort of things' that his stepdaughter had left behind when she moved out that might explain her motive for making the allegations against him. They examined the materials and found nothing helpful to the case." 29 MJ at 994. They put the box of items aside.

On January 8, 1988, during her testimony at the Article 32[4] hearing, Youie revealed—apparently for the first time to anyone—that, at some point, Rhea had given her a stereo on condition that she give him six "lovings." Because she suspected that he might try to confuse her along the way as to how many "lovings" she had given him at any point, she had recorded each instance on a calendar in her room in Rhea's apartment. When Youie was asked where the calendar was at that time, she responded: "I don't know, the last time I saw it it was in my father's house, some of my things are still there, I haven't been able to get all of my things and move them around."

Thus alerted to this potential gem of evidence, the Government immediately obtained an authorization to search Rhea's residence for this calendar. The search was fruitless.

For their part, defense counsel, similarly alerted to the materiality of a calendar that they might have previously looked at with indifference, rummaged through the box of materials their client had given them. There, counsel found a calendar with notations on it—specifically, the calendar had "written in a block on one date, 'stereo bought' and the number 6 in a circle. Then it's got a 1, 2, 3, 4, 5, 6 on various dates over the next several weeks, which was consistent with her testimony of how she noted the times that her father made her have sex with him, or she had sex with him pursuant to this agreement about the stereo."

Appropriately "concerned" that they had in their possession what appeared to be "evidence of a crime, or maybe even 'fruits' or 'instrumentalities' of a crime," each de-

NATURE, WHEN THE BOOKS WERE ADMITTED FOR THE SOLE PURPOSE OF PROVING MOTIVE, AND WHEN TRIAL COUNSEL'S USE OF THE BOOKS FAR EXCEEDED THE ISSUE OF MOTIVE, AND ADDRESSED THE SUBSTANCE OF THE CASE.
IV
WHETHER THE MILITARY JUDGE COMMITTED AN ABUSE OF DISCRETION IN PERMITTING THE PROSECUTION'S EXPERT WITNESS TO TESTIFY CONCERNING THE CONCEPT OF PARENTAL DURESS

PERTAINING TO CHARGE III, WHEN AN INSUFFICIENT FOUNDATION WAS LAID.

2. For a full exposition of these events, see the opinion of the Court of Military Review, 29 MJ 991, 992–94 (1990).

3. Youie subsequently married this man, a sergeant in the Air Force.

4. Uniform Code of Military Justice, 10 USC § 832.

fense counsel sought guidance from his state bar. "Both state organizations suggested that a ruling be sought from the trial judge as to whether disclosure was required. However, both implied that disclosure was probably necessary." 29 MJ at 994.

Apparently so that the Government would not know of the calendar if the judge did not order disclosure, defense counsel requested an *ex parte* hearing before the military judge on March 4, which was conducted on the record. After learning of the events, the military judge synthesized the question before him to be counsel's "ethical requirement to disclose evidence of a crime." Thereupon, the military judge recessed the hearing to study the question over the weekend.

When the hearing reconvened, the military judge ordered counsel to turn the calendar over "to the trial counsel at the earliest possible time so as not to hinder his pretrial preparation. No recitation of the circumstances surrounding the defense's acquisition is necessary, other than that the calendar had come into the defense's possession." Although rather lengthy, it is helpful at this point to recite fully the military judge's rationale for his order as follows:

> With regard to the issue of whether or not an item of evidence within the possession of defense counsel must be disclosed to the prosecution, I cite the Air Force Regulation 111–1, Attachment 2, dated 1 August 1984, which is the Rules for Trial Courts. And it provides in the Preamble that, "Counsel, as officers of the court, have an ethical obligation and are expected to be familiar with and to comply with the American Bar Association Code of Professional Responsibility, the American Bar Association Standards for Criminal Justice, the Manual for Courts–Martial and military case law, or applicable Department of the Air Force Regulations." And the ethical issues presented will be viewed applying the law as contained in the cited authorities.

And the issue is, does the defense counsel have an ethical or legal obligation to produce the annotated calendar of Youie Rhea that is in their custody?

Now, Disciplinary Rule 7–109(a) of the Amerian Bar Association Model Code of Professional Responsibility provides that, "A lawyer shall not suppress any evidence that he or his client has a legal obligation to produce." Similarly, the American Bar Association Standards for Criminal Justice in the Second Edition, Volume II, Chapter 11, entitled, "Discovery and Procedure Before Trial," at Section 11–4.1, provides, "Neither counsel for the parties nor other prosecution or defense personnel shall impede opposing counsel's investigation of the case." Finally, Rule for Courts–Martial 701(e) provides, "Each party shall have equal opportunity to interview witnesses and inspect evidence, and no party may unreasonably impede the access of another party to a witness or evidence." The only exception to this is if the evidence is protected from disclosure by the Military Rules of Evidence or if such is the work product of counsel or his assistants.

Now, one of the questions arising there under the Rule for Courts–Martial 701 is, does the calendar, as referred to by Youie Rhea in her cross-examination at the Article 32 investigation, constitute a confidential communication that might be privileged against disclosure under the Military Rules of Evidence 502, and Canon 4 of the ABA Code of Professional Responsibility, and I think the answer to this is no.

Under Military Rule of Evidence 502, a communication is confidential if not intended to be disclosed to third persons other than those [to] whom disclosure is in furtherance of the rendition of professional legal services to the client, and this—the subject communication, the calendar, was actually one made by Youie Rhea, not the accused, notwithstanding that the accused took possession of it pursuant to the order of his defense counsel. And so I do not think that this is a confidential communication.

And then as to the issue of, well, does defense counsel have a legal obligation to produce the annotated calendar that is in their custody, the annotated calendar in the possession of the defense was specifically sought in a search authorization of the accused's quarters, and it is apparently relevant to corroborate Youie Rhea's Article 32 testimony that she had sexual intercourse with the accused on six occasions during May and June of 1986. And defense counsel, based on my prior citation to the Rules for Courts–Martial and the American Bar Association Standards for Criminal Justice, is ethically bound to disclose this evidence and any other items within his possession which are reasonably of relevance to trial counsel's investigation of the case.

Counsel complied with the letter of the judge's order. Thereafter, Rhea successfully moved for these attorneys to be relieved from representing him and for new counsel to be appointed. In addition, the military judge recused himself on defense motion, and a new judge was assigned to try the case.

### B

At trial, the new defense counsel moved to suppress the calendar as evidence, but the new military judge denied the motion. Thereafter, counsel sought relief from the Court of Military Review via a petition for an extraordinary writ, but that court denied the petition. *Rhea v. Starr*, 26 MJ 683 (1988). In doing so, the court reasoned:

A motion to suppress evidence is an interlocutory matter addressed to the discretion of the trial judge and his decision will be reviewed on a test of abuse of discretion as are other decisions on interlocutory rulings.... We ask counsel to remember that invocation of the extraordinary writ power is a last resort, not a first thought. *DeChamplain v. United States*, [22 USCMA 656,] 46 CMR 1329 (CMA 1973). The questions raised by the petitioner during the suppression motion are unique. However, they fall within

the category of those matters that can most appropriately be addressed at trial and during the ordinary course of appellate review. *Harrison v. United States*, 20 MJ 55 (CMA 1985).

26 MJ at 685.

### C

In due course during his appeal from his conviction, appellant contended in the Court of Military Review that he had been "denied effective assistance of counsel when his" original defense counsel "voluntarily released his stepdaughter's calendar to the prosecution." 29 MJ at 994. As part of this argument, appellant challenged the propriety of the military judge's ruling on counsel's ethical responsibilities; the lawfulness of the *ex parte* nature of the hearing; and the legal responsibility of counsel to turn over the calendar to the prosecutor. In urging the latter point, appellant argued that counsel had no affirmative duty voluntarily to disclose this evidence and that, in any event, their revelation of the calendar violated appellant's attorney-client privilege. The Court of Military Review, following much the same logic as the military judge had applied, rebuffed appellant entirely.

### D

Before us, appellant urges in two separate issues: First, that original defense counsel "violated a client confidence and violated the attorney-client privilege" when they disclosed the calendar to the military judge, thereby denying appellant effective assistance of counsel; and second, that he was "denied a fair trial" when the new military judge admitted the calendar into evidence. His two-pronged argument in support of his second issue is that the hearing during which the calendar came to light was improperly conducted *ex parte* and that the military judge erred by admitting the calendar as evidence of a prior consistent statement by Youie. We disagree on all points.

As to the propriety of defense counsel's actions in revealing the calendar, the reasoning of both the military judge and the Court of Military Review is sound. Unquestionably, when the calendar was disclosed, it was relevant evidence on the charges facing appellant. Notwithstanding appellant's argument in this Court, it is not material to this characterization of the calendar whether, as the trial later was to unfold, it was corroboration of a prior consistent statement, part of the *res gestae*, an instrumentality of a crime, or whatever.

The particular evidence involved here, the calendar, was the subject of a search authorization of appellant's quarters—the last-known location of the evidence and, indeed, the location from which appellant had removed the evidence. RCM 701(e), Manual for Courts–Martial, United States, 1984, makes clear that

> [e]ach party shall have adequate opportunity to prepare its case and equal opportunity to interview witnesses and inspect evidence. *No party may unreasonably impede the access of another party to a witness or evidence.*

(Emphasis added.) Similarly, RCM 703(a) prescribes that, at trial, "[t]he prosecution and defense and the court-martial shall have equal opportunity to obtain witnesses and evidence...." *See generally* RCM 703(f)(1) and (4) (stipulating that "[e]ach party is entitled to the production of evidence which is relevant and necessary" and prescribing the procedure for obtaining such evidence).

It would have been entirely at odds with the principles underlying these rules—and, indeed, with RCM 701(e) itself—for defense counsel to withhold physical evidence that was the subject of a lawful search authorization but that had been removed by the accused from the location designated in that authorization. Counsel is ethically bound not to "[c]onceal or knowingly fail to disclose that which he is required by law to reveal." DR 7–102(A)(3), ABA Model Code of Professional Responsibility (1980). *See* Rules 3.3(a)(2) and 3.4(a), ABA Model Rules of Professional Conduct (1983). Since, certainly under the circumstances of this case,[5] disclosure was required by law, defense counsel acted in full comportment with their ethical obligation to disclose the calendar to the military judge. Of course, the military judge was correct in ordering its disclosure to the prosecution. RCM 701(e).

The one caveat to counsel's duty is that, in the course of surrendering the physical evidence, he must honor his client's confidences disclosed to counsel pursuant to the attorney-client relationship. *See* RCM 701(f)("Nothing in this rule shall be construed to require the disclosure of information protected from disclosure by the Military Rules of Evidence. Nothing in this rule shall require the disclosure or production of notes, memoranda, or similar working papers prepared by counsel and counsel's assistants and representatives."). The client's privilege in this regard, however, is limited to "confidential communications" made to the lawyer or his representative. Mil.R.Evid. 502(a), Manual, *supra; see generally United States v. Ankeny,* 30 MJ 10, 15–16 (CMA 1990).

The calendar itself was not a "communication" of any form between Rhea and defense counsel. Indeed, the only relevant "communication" on the face of this document were Youie's notations as to the time and number of the "lovings." On the other hand, Rhea's production of the calendar in the office of his counsel pursuant to their suggestion that he bring them documents left behind by his stepdaughter did constitute an implicit representation that this calendar had been left behind by his stepdaughter. Thus, the act of production

---

5. The Government has made a persuasive argument that, in *any* instance in which defense counsel finds himself in possession of physical evidence relating to the case (except, of course, evidence relating to privileged communications), he has the legal duty to deliver the evidence to the prosecution. *See* 2 ABA/BNA Lawyers' Manual on Professional Conduct 307 (No. 16, September 16, 1986), quoting *Commonwealth v. Stenbach,* No. 00244, Pa.Super.Ct., July 31, 1986).

constituted a "communication" as to the source and authenticity of the calendar.

The purpose of the attorney-client privilege is to "facilitate[ ] the rendition of professional legal services to the client" (Mil. R.Evid. 502(a)) by ensuring that whatever is privileged in the hands of the client remains privileged when disclosed to his lawyer for purposes of obtaining legal service. *See Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976); 3 Wharton's *Criminal Evidence* § 513 at 107–08 (C. Tortia 14th ed.1987). This purpose does not require that a document or object that would be subject to seizure by the Government from an accused's possession be made exempt from seizure if the accused delivers it to his lawyer. Thus, Rhea had no privilege to defeat the search authorization either by secreting the calendar himself or by placing it in the custody of his defense counsel.

The counsel, however, were not free to tell the prosecutor how the calendar came into their possession, for to do so would violate appellant's privilege that his lawyer not reveal the "communication" implicit in the act of bringing the calendar to the lawyer's office. Likewise, if Rhea's counsel—either inadvertently or intentionally—had disclosed to the Government how the calendar had come into the attorney's possession, the prosecution would not be entitled to bring this information to the factfinders' attention.

Fortunately, both the military judge and defense counsel adhered to these restrictions. Even though Rhea's original defense counsel, pursuant to the order of the first military judge, delivered the calendar to trial counsel, the prosecution did not attempt in any way to use this delivery to authenticate the calendar as evidence. Indeed, there was no reason for the Government to seek to prove the authenticity of the calendar in this way; instead, it could authenticate the calendar by Youie's testimony.

■ Appellant's twofold attack on the fairness of his trial is equally without merit. If defense counsel had a legal and

ethical duty to disclose the calendar to the prosecution, as we now hold they did, they cannot be faulted—and, as well, the fairness of the trial cannot be challenged—if, beforehand, counsel sought the military judge's ruling on the duty to disclose, out of an abundance of caution. Moreover, it would be curious, indeed, for an accused to contend that such a determination of the duty whether to disclose at all should not be reached in an *ex parte* hearing, where his "secret" would be protected if disclosure was *not* required. *See United States v. Napue,* 834 F.2d 1311, 1316–17 (7th Cir. 1987).

Defense counsel and the military judge, in all respects, acted with laudable sensitivity and responsibility to ensure that all *lawful* means of protecting appellant's interests were followed. Their conduct is to be commended, not condemned.

■ Finally, we conclude that appellant was not denied a fair trial by the actual use to which the calendar was put at trial. Youie testified without objection about her relationship with appellant, including how she marked her calendar contemporaneously with each "loving" in order to keep track of how many times she had engaged in intercourse with Rhea—pursuant to his offer to trade her a stereo for sex. Thus, it was adequately established that the prior consistent statements on the calendar were made by Youie at a time before her motive to fabricate might have arisen—if, as appellant claims, she had such a motive, *see* Mil.R.Evid. 801(d)(1)(B); *United States v. McCaskey,* 30 MJ 188 (CMA 1990). Moreover, the notations on the calendar—as explained by Youie's testimony—constituted direct evidence of the crime.

Accordingly, we conclude that in no way were the disclosures of the incriminating calendar and its ultimate use in evidence improper.

## II

■ After she had disclosed appellant's sexual abuse of her, Youie was interviewed by Special Agent (SA) Welch of the Air

Force Office of Special Investigations. The parties stipulated at trial what occurred, relevant to this issue, as follows:

> During the interview, Ms. Rhea, when asked by SA Welch, indicated the accused had a collection of pornographic movies, monthly periodicals, and books, all of a pornographic nature. These items were in the accused's apartment which Miss Rhea shared. Specifically, the movies were kept in the living room area and the books and magazines were kept in the accused's bedroom. Miss Rhea observed the four books offered by the Government at various times on the accused's bed and bedroom floor when she cleaned his room. She told SA Welch that she had seen the books several days before making the complaint.
>
> Based on this interview, SA Welch prepared a search authorization and supporting affidavit.... The information contained in the affidavit was supplied by SA Welch and was the basis for the search authorization. The books being offered by the Prosecution were seized from a drawer near the accused's bed in his bedroom. The sexual abuse, as described by the victim, primarily occurred in the accused's bedroom. The four books found in the accused's bedroom and being offered by the Government are: "Uncle Freddie's Little Playmates," "Lust's What the Doctor Ordered," "Sexual Cruelty: Girls who are Raped," "Fifteen and Hot for Her Uncle."

Admissibility of these four books was hotly contested at trial. The military judge deferred his ruling until he had an opportunity to perceive the state of the evidence.

In its case-in-chief, the prosecution portrayed appellant as a stepfather who was sexually obsessed with his stepdaughter and had carried out his sexual desires with her since she was 13 years old. Moreover, according to the Government, Rhea's fixation with the girl was so great that, in a fit of jealousy, he had attacked her and her boyfriend when he found them together in the latter's apartment—this attack being motivated not by instincts of an outraged

father but by the jealousy that was a part of the unnatural sexual obsession that he felt for Youie. Contrariwise, appellant denied altogether the charges of sexual misconduct and described a strong motive for the prosecutrix to lie. As to the assaults, he asserted that, when he found his stepdaughter with her boyfriend, his actions were a parental response, not a sexual one.

After both the prosecution and the defense had presented their cases-in-chief, the military judge further considered admissibility of the books. After hearing from both counsel, he ruled:

> During the last week, I have had ample opportunity to ... read all four books. I'm not going to admit ... "Lust's What the Doctor Ordered." Any marginal relevance it may have by containing one situation of inner-family sex, I think, is outweighed by the waste of time involved in reading that book. The predominant theme of this book relates to the sexual activities of a doctor.... I'm going to exclude it as a prosecution exhibit under [Mil.R.Evid.] 403, as it generally does not relate to sex between older men and young girls.
>
> The three other books, "Sexual Cruelty, Girls Who are Raped," "Uncle Freddie's Little Playmates," "Fifteen and Hot for Her Uncle," I find relevant under [Mil.R.Evid.] 401 on the issue of motive. Contrary to the defense position under *United States versus Watkins*, 21 MJ 224, I conclude that an accused's denial of events does not prevent the prosecution from presenting motive evidence.
>
> These books were found in the accused's bedroom, and the alleged victim said she saw these books on the accused's bed and bedroom floor on occasions when she would clean the room.
>
> The theme of all three books is that of older men engaging young girls in sexual activities, sometimes by physical force, sometimes not.
>
> I note from the evidence in this case, there is close to a thirty-year difference in the ages of the accused and the alleged victim.

I find the three books relevant on the issue of motive. And under [Mil.R.Evid.] 403, I find the prejudicial impact to the accused not to substantially outweigh the probative value to the Government.

The possession of such books is not an illegal act. This trial essentially boils down to a one-on-one case. I've balanced the competing interests, and on 403, I find in favor of the Government. The three books may be admitted on the theory of motive. I am not going to admit them on a theory of intent. The limiting instruction will cover only motive.

Prior to closing argument by either counsel on findings, the military judge gave the limiting instruction he had promised:

Members of the court, before permitting counsel to argue their cases, I'm going to give you one legal instruction at this time.

I have admitted three books into evidence. The books admitted as Prosecution Exhibits 3, 4, and 5 may be considered by you only for the limited purpose of their tendency, if any, to prove that they establish a motive for the accused to commit the offenses of rape of Youie Rhea, forcible sodomy of Youie Rhea, and indecent acts with Youie Rhea. Now, "motive" is defined in law as, that which incites or stimulates a person to do an act. You may not consider this evidence for any other purpose, and you may not conclude from the evidence that the accused is a bad person, or has criminal tendencies, and that he therefore must have committed the referenced offenses.

Counsel then offered their arguments to the members. The following excerpts from trial counsel's presentation put into perspective the prosecution's theory of the case and the role of the books in proving that theory:

The accused's conduct toward Youie and her boy friends speaks far more than fatherly concern and love. It speaks jealousy. That's what he was. He was jealous of these people who would take Youie, his sexual partner, from him.

And that's why he'd beat them up, and we'd see fits of rage. That's why he beat up Wayne on the 10th. That's why he got into the altercation with him in July.

His was a compulsive relationship with her.... [H]is went far beyond the normal healthy relationship.

\*   \*   \*   \*   \*   \*

The perfect family. A man who is embarrassed at seeing his daughter's nudity or partial nudity. I submit to you that that is not the accused. That the accused is more a man who gets stimulated and excited to engage in incestuous activities. Such things as are found in these books, found in the accused's bedroom at various times, on the accused's bed and bedroom floor. Is he a man who got embarrassed, or a man who got stimulated and incited, by language like, "Girls were probably to be fucking at this age." Such things as, "This case is typical, in that the man who took the virginity of the girl was someone in a condition of power over her. Sometimes this power is love, but more often it is a situational power." Such things as this: "She was only thirteen and she had never done it before, but she liked it and Fred's life suddenly took a turn for the better. She was such a nice little girl, it would bring his heart great joy to teach her all the things his wife would never learn. She was so young, so unspoiled, free of neurosis and willing to learn. She liked him. She liked fucking. She was only thirteen."

(TC was reading from Prosecution Exhibits 3, 4 and 5.)

Defense counsel responded in similar fashion:

Now, one other thing has come up, in fact, in the argument of the prosecution is, well, now, you've got these books. (Indicating Prosecution Exhibits 3, 4 and 5.) This is going to be—if you rely on these books, this is as bad—these books, he is not here being prosecuted for having bad literary taste. These books, yeah, they are garbage. But think about

it. Could be joking a little bit. A little snicker. Do you know if he even bought them? Do you know how he got these? No. You don't. You know when you did get them, you didn't get them until the end. But you know something that the Judge told you. The Judge has told you that the only use you can make of these books is but one: For motive. And what he told you that motive is—motive is the cause for someone to act.

Okay, now the prosecution—not only are they trying to say, well, it was this perverted jealousy—remember, that's why he went over to the Davis' house that night. Not only are they distorting that, but now they are using these books to say these books—I mean think of it. They are saying motive equals cause? These books caused him, this caused him, to rape her. It's ridiculous. Well, so I guess you look at "Hustler" and that's going to cause you to go do something. Well, I guess now when you find a guy that you think stole a car, you're going to go into his house and you're going to find "Car and Driver," and you're going to go, "Boy, he was looking at that brand new Corvette that's out that's got almost 300 horsepower, and that caused him to steal it." That's garbage. Why didn't they have their psychologist telling you about that. That's garbage....

\* \* \*

Oh, the Government wants you to believe that these books—they caused him to do it. (Indicating Pros Exs 3, 4 and 5.) Better get the "Car and Driver" out of your house.

Finally, in his rebuttal argument, trial counsel again briefly addressed the relation of the books to the prosecution's theory of the case:

The books. The Government has not contended anything about these books beyond that you should consider them when a man takes the stand and tells you that he is embarrassed by nudity, and denies any of this would happen. And you read carefully and you find dominant themes in these books about adult males

and sex with younger girls, some of whom are their relatives, as to whether in fact he didn't find stimulation in that kind of material, and an incentive to engage in the same kinds of acts himself.

In this Court, appellant argues that the military judge erred in admitting the books into evidence and that trial counsel erred in arguing the evidence as he did. Appellant submits that "motive" evidence is not relevant—and, thus, not admissible—when the accused flatly denies the alleged acts; and that, in any event, the probative value of the books was far outweighed by the danger of unfair prejudice to appellant. We disagree.

In *United States v. Mann*, 26 MJ 1 (CMA), *cert. denied*, 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988), this Court was faced with a case which, on its relevant facts, was strangely like the one now before us. There, as here, the accused was charged with committing indecent acts and sodomy on his minor daughter; there, as here, the accused, in part, denied the acts had occurred at all; there, as here, the challenged evidence in part consisted of books depicting pornographic sexual acts between adults and children. "Consequently," there, as here, "appellant's sexual interests with regard to young girls ... was a material issue for the members to resolve. Mil.R.Evid. 404(b), 1984 Manual, *supra*." 26 MJ at 3.

As this Court noted:

The first question for the military judge was whether the challenged pictorial evidence was relevant to show that appellant had this sexual desire during the charged acts. *See* Mil.R.Evid. 401. In other words, could these photographs be naturally interpreted as reflecting a passion on his part at that time towards young girls.... *See generally* 2 Wigmore, *Evidence* § 399(b) and (c) (Chadbourn rev.1979).

26 MJ at 3. We concluded there—and we conclude here—that the accused's books which were found at the crime scene and indicate a unique sexual interest precisely like that reflected in the charged acts

"could reasonably be viewed as reflecting or tending to reflect his sexual desires during the charged acts." *Id.* at 4.

■ Similarly, in *United States v. Orsburn*, 31 MJ 182 (CMA 1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1074, 112 L.Ed.2d 1179 (1991), we upheld admissibility where the accused had denied the claimed acts with his minor daughter that led to charges of rape, sodomy, and committing indecent acts; in our view, the military judge had a sufficient basis to conclude that books that were discovered in the closet of the accused's bedroom where the alleged acts occurred and that explicitly depicted sex with children or young girls "tended to show appellant had the requisite sexual desires" implicit in the lesser-included offenses of indecent assault and committing indecent acts on a child.[6] (31 MJ at 187). The same reasoning leads us to conclude here that appellant's books indicate his motive for the charged misconduct. *See United States v. Watkins,* 21 MJ 224, 227 (CMA), *cert. denied,* 476 U.S. 1108, 106 S.Ct.1956, 90 L.Ed.2d 364 (1986).

■ Appellant gets no relief by relying on Mil.R.Evid. 403. The military judge expressly considered whether the books offered a greater risk of unfair prejudice to appellant than they offered as probative value to the prosecution. His reasoning was logical; we shall not disturb it under circumstances where the evidence was so carefully handled both by the military judge and by the prosecution. *See United States v. Orsburn* and *United States v. Mann,* both *supra.*

### III

■ Appellant's next allegation of trial error concerns testimony of Major Nancy Slicner, a clinical psychologist who was accepted as an expert "with specialized knowledge" in the field of sexual offenders and sexual abuse victims. In the part relevant to this issue, Slicner testified concerning the concept of parental duress in cases of incest. Essentially, appellant's trial objection was "that her testimony is without adequate scientific foundation under M[il]RE[vid.] 702, and lacks any relevance to any issue in the Government's case-in-chief under M[il]RE[vid.] 401 and 402."

In response specifically to the objection under Mil.R.Evid. 702, trial counsel argued:

[I]t's the United States' contention that it's incorrect to focus on simply the scientific or technical knowledge aspects of an expert witness' area of focus, that Rule 702 reads, "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Citing *United States v. Snipes,* 18 MJ 172 (CMA 1984), and *United States v. Arruza,* 26 MJ 234 (CMA 1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989), trial counsel urged that Slicner's testimony did not need "a scientific or technical basis" to be admissible; rather, those cases, he argued, acknowledge that experts with experience in the area of child sex abuse and its victims "have specialized knowledge and experience that can be helpful to the trier of fact."

Ultimately, the military judge overruled the defense objection to Slicner's anticipated testimony, stating that, "based on the proffer of her expected testimony, I find it

---

**6.** Notwithstanding defense counsel's creative treatment of the books in his closing argument, we do not believe that the military judge's ruling, his limiting instruction, or trial counsel's closing argument or comments in rebuttal fairly can be read to suggest that the books compelled appellant to abuse his victim. Instead, it is clear to us that the purpose for which the books were admitted and used was to reflect appellant's unnatural sexual appetite for young girls that would tend to prove appellant's motivation for his abusive conduct with Youie. In the rebuttal stage of this trial, after the defense case-in-chief had portrayed appellant as a naturally loving father, the military judge acted within his discretion in concluding that the challenged books were relevant to show the contrary. *See* Mil.R.Evid. 404(b), Manual for Courts–Martial, United States, 1984.

to be relevant under [Mil.R.Evid.] 401, helpful under [Mil.R.Evid.] 702 as expert testimony, and not barred by [Mil.R.Evid.] 403."

We affirm the military judge's ruling. It is clear from the evidence and from argument of counsel that the prosecution theorized that constructive force in the form of parental duress was the means by which appellant overcame Youie's lack of consent. Accordingly, appellant may not gainsay the relevance of evidence which tended to make presence or absence of constructive force through parental duress—a "fact that is of consequence to the determination of the action [—] more probable or less probable than it would be without the evidence." Mil.R.Evid. 401; see Mil.R.Evid. 402.

"To recognize that a parent or authority figure *can* exert a moral, psychological, or intellectual force over a child is merely to recognize the obvious." *United States v. Palmer*, 33 MJ 7, 10 (CMA 1991). Thus, it might be argued that "expert" testimony is not necessary to assertion of this theory of constructive force. On the other hand, it does seem likely that most court members who also are parents would not have personal experience with using their relative position of authority to manipulate their children's emotions for their own gain. Accordingly, we cannot say that the military judge erred in concluding that testimony like Major Slicner's offered "specialized knowledge" that would "assist the trier of fact to understand the evidence or to determine a fact in issue." Mil.R.Evid. 702.

Trial counsel persistently pursued evidence of appellant's psychological manipulation of Youie through his parental position of authority and trust, and he strenuously argued that evidence at every opportunity. In this context, Slicner's testimony, which simply helped explain the concept in a helpful way for the members, did not present such a risk of confusion or "danger of unfair prejudice" as to outweigh "its probative value" to the Government's case. Mil.R.Evid. 403.[7]

## IV

■ Charge III alleged that Rhea raped Youie "on divers occasions" between December 1984 and October 9, 1987. Charge IV alleged sodomy "on divers occasions" between November 1, 1986, and October 9, 1987. At the time of trial in October 1988, Youie was 20 years old and her next birthday would be in November. The government evidence established that she had come to live with her mother and Rhea, who was her stepfather, when she was 9; that, by the time she reached 12, Rhea had made various sexual advances to her; and that he had engaged in sexual intercourse with her on many occasions before the first date alleged in Charge III.[8]

As has already been discussed in connection with admissibility of the calendar, Youie had engaged in some of the more recent acts of intercourse with the expectation of receiving a stereo in return for her "lovings." Such an exchange of sexual favors for a promised gift usually would not qualify as rape or carnal knowledge where the woman involved is 19 or 20 years old. Likewise, if the sexual favors included engaging in sodomy, the male would not be guilty of committing sodomy by force.

To deal with the obvious problem of establishing rape during the period covered by the charges—and because Youie was too old at the times involved for the Government to prosecute him for carnal knowledge, see Art. 120—the Government relied on a theory of duress exercised by a person *in loco parentis*. Basically the

---

7. Dr. Slicner's expert testimony gave rise to a question by a court member as to whether she could determine if accusations were fabricated. This type of question illustrates why we are concerned that the military judge seek to assure that factfinders not abdicate their role of evaluating truthfulness in favor of the expert.

8. Prosecution for acts of intercourse that had preceded December 1984 was barred by the 3-year statute of limitation that was then in effect. Article 43 of the Uniform Code of Military Justice, 10 USC § 843, was amended in 1986 to lengthen the statute of limitations. Pub.L.No. 99-661, div. A, title VIII, § 805(a), 100 Stat. 3908.

premise was that, when she was a young girl and had originally come to live in the home of appellant, he had used his position as her stepfather as a means of coercing her into having intercourse with him. Thus, the force alleged was "constructive."

In *United States v. Palmer, supra,* this Court recognized that a parental relation may be a circumstance to be considered in determining whether sexual intercourse occurred with the woman's consent. Moreover, we recognize the logic in this view expressed by Justice Martin of the North Carolina Supreme Court:

> Sexual activity between a parent and a minor child is not comparable to sexual activity between two adults with a history of consensual intercourse. The youth and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose.

33 MJ at 9, quoting from *State v. Etheridge,* 319 N.C. 34, 352 S.E.2d 673, 681 (1987).

Thus, in *United States v. Torres,* 27 MJ 867 (1989),[9] the Air Force Court of Military Review, in upholding a finding that a 13–year–old foster child had not willingly consented to "sexual intercourse with an individual standing *in loco parentis,*" properly noted:

> The force used to accomplish sexual intercourse may be actual or constructive. *United States v. Hicks,* 24 MJ 3 (CMA 1987). Further, the force used need not be overt and physically brutal, but can be subtle and psychological. *State v. Fowler,* 27 Ohio App.3d 149, 500 N.E.2d 390 (1985). In such a situation the equiva-

lent to physical force is present. *United States v. Dejonge, supra* [16 MJ 974 (AFCMR 1983), *pet. denied,* 18 MJ 92 (CMA 1984)]. Clearly, a 13 year old child should not be expected to resist in the same manner as a mature adult.

27 MJ at 869.

The problem in the instant case is that the acts of intercourse and sodomy with which Rhea is charged occurred when Youie was significantly older than the victim involved in *Torres*—which the court below cited in upholding the sufficiency of the evidence against appellant. Moreover, much of the sexual intercourse that was alleged occurred after Youie had voluntarily come to Germany and at a time when appellant was divorcing her mother. At that point Youie was able to drive and already had a sexual history apart from her relations with Rhea.

With this in mind, we believe that the court below should undertake a further review of the sufficiency of the evidence and the instructions in light of *United States v. Palmer, supra.* In this connection, they should especially focus on whether the "subtle and psychological" effects of Rhea's relationship to Youie—to the extent that relationship still existed—were *still* sufficient to constitute "constructive force" during the period embraced by Charges III and IV.

V

The decision of the United States Air Force Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Air Force for remand to that court for further review.

Chief Judge SULLIVAN and Judge COX concur.

---

9. *See* appellate history, 33 MJ at 10.